FILED

07/05/2022

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 26, 2022 Session

**STATE OF TENNESSEE v. TOBY DUNN**

**Appeal from the Circuit Court for Cocke County**
**No. 6215      James L. Gass, Judge**

_____

**No. E2021-00343-CCA-R3-CD**
_____

The Cocke County Grand Jury indicted Defendant, Toby Dunn, for attempted first degree murder in count one, aggravated assault in count two, employment of a firearm during the commission of a dangerous felony in count three, and possession of a firearm during the commission of a dangerous felony in count four.  A jury found Defendant guilty in count one of the lesser-included offense of attempted second degree murder and guilty as charged in all other counts.  At sentencing, the trial court merged counts one and two and merged counts three and four.  The court sentenced Defendant to twelve years' incarceration with a thirty percent release eligibility in count one and to a consecutive six years' incarceration with a 100 percent release eligibility in count three.  On appeal, Defendant argues that the trial court erred by limiting cross-examination of the victim, by excluding a video of the victim, and by admitting Defendant's prior bad act.  He also argues that the State failed to establish the chain of custody for the firearm, that the evidence was insufficient to support his convictions, and that his sentence was excessive.  After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Gregory P. Isaacs and J. Franklin Ammons, (on appeal), and Charlotte Ann Leibrock and William Leibrock, (at trial), Knoxville, Tennessee, for the appellant, Toby Dunn.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and J. Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural History

This case arises from the shooting of the victim, Crystal Dunn, by Defendant in their home. Defendant was growing marijuana in the home, which caused arguments between the victim and Defendant. The victim stated that she wanted to leave the home and take her son with her, and Defendant tried to stop her. She threatened to expose Defendant's marijuana growing operation, and Defendant shot her three times. Two bullets went through her arms, through her chest, and into the wall, and a third bullet hit her leg. The victim survived and told responding officers at the scene that Defendant tried to kill her.

### *Pretrial 404(b) Hearing*

The trial court held a pretrial hearing regarding prior bad act evidence under Tennessee Rule of Evidence 404(b). Tennessee Bureau of Investigation ("TBI") Special Agent John Sipos testified that he responded to a shooting incident on Lane Drive on January 14, 2015. He said that Defendant gave consent to Sheriff Armando Fontes to search the home. Agent Sipos found a marijuana grow room in the rear spare bedroom. He testified that:

> We found what appeared to be dirt and/or potting soil on the floor through the living room area, leading back to the back bedroom. We were unable to enter the back bedroom at the beginning of the walk through due to a pit bull dog that had just given birth to puppies that [was] there in that back bedroom, and unable to gain entry at that time. . . . [The dog's puppies] were located in the room adjacent to the kitchen, at the front of the residence.

Agent Sipos said the door to the rear spare bedroom was not locked but that it was shut with the pit bull dog inside. TBI agents called animal control to remove the dog from the bedroom. At that point, agents "found more dirt and/or potting soil[,] a sprayer, fans, lighting equipment, and tarps[.]" There were no plants in the room but a marijuana leaf was found in the adjacent bedroom.

Agent Sipos interviewed the victim and learned that she had a photograph of Defendant holding a sprayer in the grow room with marijuana plants. Agent Sipos analyzed the photograph and found that it was taken with a Samsung cellular phone on December 31, 2014, two weeks before the shooting.

On cross-examination, Agent Sipos agreed that the TBI did not take any marijuana plants from the home on the day of the shooting.

- 2 -

The victim testified that she took the photograph of Defendant holding a sprayer in the grow room on December 31, 2014. She said that Defendant was aware that she took the photograph and that he told her to delete it. The victim said that she did not participate in the "pot operation" and that she did not like it. She said that, in the two weeks between the photograph and the shooting, Defendant argued with her about the photograph.

The victim testified that, on the day of the shooting, she decided to move out of the home with her minor son, B.D.[1] Defendant told her that she "wasn't leaving," and she responded that she would "tell on him about the grow room." She said that, after Defendant shot her, he pulled up the plants and removed them from the house. The victim recalled that Defendant said he shot her because she was "going to turn him in for the pot[.]" He told her that he did not believe she had deleted the photograph.

On cross-examination, the victim denied that she had anything to do with the marijuana grow room.

On redirect examination, the prosecutor read a portion of the victim's statement to police: "[Defendant] said, 'Die, bitch, that'll teach you to run your mouth[.']" When asked what Defendant's words meant to her, she replied, "I told him I was going to tell if he didn't let us leave. . . . That I was going to tell the law[.]"

The trial court ruled that the evidence of the marijuana grow room was admissible. It stated, "Quite frankly, you know, I don't know how you could try this case without letting it all in. It's a part of it." In a written order, the trial court explained that the State had proven the prior bad act by clear and convincing evidence, that the evidence was relevant to show motive, and that the probative value of the evidence outweighed any prejudicial effect.

### *Trial*

#### State's Proof

Cocke County Sheriff's Department (CCSD) Deputy Brian Holt testified that, on January 14, 2015, he was dispatched to an address on Lane Drive in Newport at approximately 4:00 p.m. Deputy Holt was the second officer to arrive on the scene after Constable Mike Shropshire, and he saw the victim exit the right side of the residence. Defendant was also in the yard between the victim and the house, and Deputy Holt noted that Defendant was calm and that he was not assisting the victim. Deputy Holt and Constable Shropshire approached the victim and saw that she was injured. While

---

[1] It is the custom of this court to refer to minors by their initials.

Constable Shropshire administered first aid, Deputy Holt entered the house and secured the scene.

Once inside, Deputy Holt saw a "large frame" handgun on the coffee table. In the front bedroom, Deputy Holt saw blood on the bed and on the floor, a spent .45 shell casing on the floor, and a "small frame handgun" lying on the bed. Deputy Holt did not touch or collect any evidence in the front bedroom.

Defendant entered the house and asked Deputy Holt if he could sit with B.D. on the couch. Deputy Holt asked Defendant if there were any weapons in the house. Defendant told Deputy Holt that there was a handgun underneath the couch cushion, which Deputy Holt retrieved before letting Defendant sit down. Defendant told Deputy Holt, "[T]he gun I shot my wife with is on the coffee table[.]"

Deputy Holt asked Defendant and B.D. to move into the kitchen away from the evidence. Deputy Holt stayed with Defendant for approximately two hours until the TBI arrived to process the crime scene. During that time, Defendant did not exhibit any emotions. Deputy Holt, along with other officers, secured the home until it was turned over to the TBI.

On cross-examination, Deputy Holt was asked if he touched the .45 caliber handgun that was on the coffee table. He explained, "No. No, if I did, it would have been after the [TBI] investigation. You know, they done everything -- now, if they had asked me to, I would have, but I wouldn't have until they was ready, you know, to bag it in evidence."

CCSD Chief Deputy John Carroll testified that he and Sheriff Fontes went to the scene on Lane Drive, where he saw Constable Shropshire and Deputy Holt. Deputy Carroll observed the victim on a cot with several gunshot wounds. Two paramedics were attending to her. Deputy Carroll described the victim as "frantic" and "scared." The victim told Deputy Carroll that she was dying and repeatedly said, "[D]on't let him get away with this, he's tried to kill me."

Deputy Carroll saw Defendant calmly standing outside. He never saw Defendant attend to the victim. Deputy Carroll recalled that, because the victim's situation was so serious, both paramedics believed they needed to be in the back to give care to the victim. Therefore, Deputy Carroll drove the ambulance to the University of Tennessee Medical Center.

The victim testified that, on January 14, 2015, she was living with her son, B.D., and Defendant on Lane Drive in Newport. The victim recalled that she was working full

- 4 -

time as a waitress but that Defendant was not employed. She explained that this caused financial difficulties, which led to arguments with Defendant.

The victim stated that she and Defendant also argued because she found a marijuana "grow room" in the house and she objected to it. She explained that she did not want Defendant's activities to cause the State to take her son away. The victim identified a photograph she took of Defendant in the grow room. She said that Defendant was upset that she took the photograph and told her to delete it, so she emailed it to herself and then deleted it. Defendant brought up the photograph several times afterwards and argued with her because he was afraid she would turn him in. Each time, she responded that she had deleted the photograph.

The victim said that, on January 14, 2015, she decided to leave Defendant and move to her mother's house. Defendant argued with the victim and told her she was not leaving. B.D. became upset when Defendant yelled, so the victim lay down on her bed to allow B.D. time to calm down. Defendant came into the bedroom and argued with the victim and then left. Defendant then returned to the bedroom, and she heard B.D. say, "Mama, [D]addy's got a gun[.]" The victim looked up and saw Defendant with a gun, and then Defendant shot the victim three times. The victim sustained five entry and five exit wounds because the bullets entered and exited through her arm and wrist into her chest and collarbone as well as her thigh. The victim said that she owned a .22 Ruger handgun but that she did not have it at the time Defendant shot her. She recalled that Defendant had a "twenty-five" handgun that he kept in his nightstand but said that she did not have that weapon when Defendant shot her.

Defendant left the bedroom, and the victim made her way into the living room to check on B.D., but she collapsed on the living room floor. Defendant did not check on her but instead went into his grow room to take the marijuana plants out of the house. She lay on the floor for thirty minutes or more while Defendant removed plants from the house. The victim also heard Defendant on the phone with his mother. Defendant then came over to the victim and said, "Die, bitch." He talked about the photograph she took of him in the grow room and said that she "was going to learn."

The victim said that she did not hear Defendant call 911 but that she later learned that he did. B.D. told the victim that Constable Shropshire had arrived, so the victim "picked [her]self up out of the floor and made it out the side door." She saw Deputy Carroll and said, "Please don't let me die and please don't let [Defendant] get by with this."

TBI Special Agent John Sipos interviewed the victim while she was at the hospital and that she turned over her email containing the photograph she took of Defendant in the grow room.

During a jury-out hearing, defense counsel sought to introduce a video depicting the victim using drugs two months before the shooting. The victim testified during the jury-out hearing that she had a drug problem in the past. She denied that, when she was admitted to the hospital for the gunshot wounds, she had an opiate dependency. She recalled that she had been going to a Suboxone clinic since November 2014 but denied intravenous drug use at the time of the shooting. The victim stated that, both at the time she was shot and at the time of her testimony, she was not taking any controlled substance that had not been prescribed to her. She denied that the lawfully prescribed medications she was taking impaired her ability to function or have an accurate memory.

After viewing the video of the victim two months prior to the shooting, where the victim appeared to be asleep on the couch next to a cigarette, the trial court ruled it inadmissible under Tennessee Rule of Evidence 401. The trial court stated:

> The court finds after reviewing that video, it's completely irrelevant to the testimony of this witness. It shows -- the video reflects what it reflects. It appears that she's nodding off or in a tired or intoxicated state. I don't know of what nature, but she's about half asleep and then arouses about, rubs the top of her head and the video ends.

Next, the State argued that, pursuant to *State v. Dicks*, 615 S.W.2d 126 (Tenn. 1981), defense counsel should not ask the victim questions about her pending charges for theft in Greene County if the court knew in advance that the victim planned on asserting her Fifth Amendment privilege against self-incrimination. The court allowed defense counsel to question the victim, with the victim's counsel present, outside the presence of the jury to determine whether the victim intended on asserting her Fifth Amendment privilege. Defense counsel asked the victim several questions regarding pending charges in Greene County, and the victim asserted her Fifth Amendment privilege in response to each question. The trial court stated, "[T]he preferable practice is to not have the witness questioned in front of the jury because no inference can be drawn" based upon the witness's assertion of her Fifth Amendment privilege. "If no inference can be drawn, there's no reason to ask those questions unless someone intends to benefit from it, either the State or the defense." The trial court ruled

> that no questions pertaining to any statements, confessions, activity related to a charge of theft or burglary or stemming from those type of charges in Greene County, Tennessee[,] which are presently pending against [the victim] nor any competency issues, assertions by her lawyer as to her state of mind shall be allowed to be asked of her in the presence of the jury.

When the jury returned, defense counsel cross-examined the victim. On December 3, 2014, the victim wrote a note to Defendant:

I will not go down without bloodshed, especially when I've not cheated and especially when I'm giving us my all. . . . [Defendant], I'm sorry for my mistakes and I pray for them every day, especially when you're being mean and hateful towards me. I've not done nothing for you to leave me over. I'm doing everything I can to make many issues, areas of my life better, everything you have asked or you ask, so please treat me like I'm your wife. I will not lose my family or our family and I will fight for you and us till my death.

The victim testified that, at the time she wrote the note and at the time of the shooting, she was taking Clonazepam for "nerves" and Suboxone for opiate dependency. She agreed that, at the time of trial, she was still taking both Clonazepam and Suboxone and that both had been prescribed to her by a medical doctor.

A recording of the day of the shooting was then played for the jury, where the victim was talking to law enforcement and medical personnel while they provided medical attention. The following exchanges were on the recording:

[THE VICTIM]: Please don't let him get by with it.

[OFFICER]: Okay, tell me what happened.

[THE VICTIM]: We'd been fussing.

[OFFICER]: You'd been fussing, then what happened? He shot you? Did you have a – did you have a weapon on you?

[THE VICTIM]: (unintelligible) get my gun out.

[OFFICER]: Did you have one on you?

[THE VICTIM]: It's in my purse (unintelligible).

[OFFICER]: Okay, did you pull your gun?

[THE VICTIM]: I went to get it after he pulled his, and he shot me.

[OFFICER]: Okay, so you went to get yours after he pulled his?

[THE VICTIM]: Yes.

[OFFICER]: Okay, so you didn't have a gun?

[THE VICTIM]: Don't let him get by with it.

. . . .

[OFFICER]: You didn't have a gun in your hand, right?

[THE VICTIM]: No, not when he shot me.

. . . .

[OFFICER]: [The victim], did you have a weapon at all in your hand?

[THE VICTIM]: No.

[OFFICER]: No?

[THE VICTIM]: He pulled a gun on me.

When cross-examination resumed, the following exchange occurred:

[DEFENSE COUNSEL]: [The victim], have you had several criminal charges out of the Sessions Court here or convictions?

[THE COURT]: Wait a minute before you answer that, ma'am.

[THE STATE]: My objection, that's not the proper way to ask as far as impeachment. That's a very open question.

. . . .

[THE COURT]: You can rephrase your question and ask about convictions.

Defense counsel concluded her cross-examination but did not ask the victim about her convictions.

- 8 -

Agent Sipos testified that he processed the scene of the shooting on January 14, 2015, as the case agent in charge of investigation. He said that his team entered a room where they found a silver tarp, a sprayer, buckets, soil, milk crates, a fan, and lights. Based on his experience, Agent Sipos determined it was a marijuana grow room. He said that a trail of soil went out of the room and through the living room. The TBI agents then found a marijuana leaf on top of a chest of drawers in the master bedroom.

Agent Sipos photographed Defendant approximately two to two and a half hours after the shooting. He noted that Defendant did not have any recent injuries to his face but that there was an injury to his right thumb and the back of his neck. Agent Sipos also indicated that Defendant had a "clothing burn/rash burn of some sort" around his elbow, a red mark on his chest, and a mark on his left shoulder blade. Agent Sipos stated that there were two blood stains on Defendant's clothing on his right thigh but that he did not find any red stains on his hands and arms that would be consistent with blood.

Some time after the shooting, the victim sent Agent Sipos the photograph of Defendant in the grow room dated December 31, 2014.

On cross-examination, Agent Sipos stated that the TBI agents never recovered any marijuana plants except for one leaf from the master bedroom. He explained that agents searched the house and the property but that they were unable to search the pond on the property. In addition to the guns found at the property by deputies, Agent Sipos also found a taser and brass knuckles. Agent Sipos stated that the guns that were photographed were not in their original positions and that the CCSD had handed the guns over to TBI agents. The following exchange occurred:

[DEFENSE COUNSEL]: So someone else touched [the guns] before you all actually got there and marked them?

[AGENT SIPOS]: Yes

. . . .

[DEFENSE COUNSEL]: [F]or a lot of these pictures[,] things were moved prior to you all marking them, were they not?

[AGENT SIPOS]: There were people at the residence before we arrived. I can't say what they did. I do know that the weapons were handed to us because the officers had made them clear or safe when we arrived on scene, but prior to our arrival.

TBI Special Agent Denise Woodby testified that she helped process the scene of the shooting on January 14, 2015. She noted dirt on the floor in the living room and in the grow room. She found a "larger pool of blood in the living room" with a "trail that led back to the bedroom." In the bedroom at the foot of the bed, she saw a blood drop trail and shell casings. Agent Woodby saw "some blood pooling" on the bed with a blood trail and blood spatter nearby. There was also a weapon, a purse, and a bullet on the bed. The gun found on the bed had blood spatter on its side facing up, but there was no blood on the underside of the gun.

Defense counsel objected to the admission of the .45 handgun used in the shooting, arguing that the State had not established the chain of custody. Agent Woodby testified that, when she first arrived on the scene, CCSD deputies had already secured the scene and that they directed her to a brown paper evidence bag containing the .45 caliber handgun. When asked if she knew who placed the gun into the evidence bag, Agent Woodby responded, "Only what I was told."

Outside the hearing of the jury, the following exchange occurred:

[THE COURT]: She got it in the living room whether it be from [D]efendant or some third party; however, you have indicated that you have a witness due to chain of custody could identify they tested this gun that's in that box.

[AGENT WOODBY]: Yes, sir.

[THE COURT]: And that that firearm discharged the three bullets that struck the victim in this case?

[THE STATE]: Yes, sir.

[THE COURT]: So it was there. It was used to strike her. Whether or not it was your client's gun altogether is a different matter, but it was the one that was there at the time she was struck, that's what you expect it to show?

[THE STATE]: That as well as Deputy Sheriff Holt said [D]efendant admitted ["]that's the gun I used that was there in the living room.["] But again, this is a case ultimately going to be of self-defense and as the court knows, the State doesn't have to prove every link in the chain or just to satisfy the court that --

[DEFENSE COUNSEL]: But I think it's one of the most important links of how it got in that bag. It's a pretty important link.

- 10 -

. . . .

[THE COURT]: All the State would have to show is they retrieved a gun in the house that later was confirmed to be the gun that fired the projectile that struck the victim three times or was shot three times. . . . I will note your objection and I will overrule it.

In the presence of the jury, Agent Woodby identified the writing on the gun box as her own and stated that the gun inside the box was the same gun from the evidence bag which she retrieved from the living room. She explained that, when she unloaded the gun for examination, she found that three rounds were missing.

Agent Woodby found two bullets imbedded into the wall near the bed. Agent Woodby explained that, based on the shape of the defects in the wall, the trajectory of the bullets had passed through an "intermediate target." She said that the lack of blood spatter on the wall where the defects were found was "consistent with an individual's body being placed there[.]" Agent Woodby also noted that the side table drawer next to the bed had blood inside, indicating that the drawer was open during the "bloodshed event." Further, she saw a void in the pattern of the blood in the drawer, which was "consistent with an object such as a gun being moved from the drawer to another location."

On cross-examination, Agent Woodby stated that she did not measure the size of the void in the drawer where there was no blood.

Agent Woodby then testified as an expert in bullet flight path, which is the study of the angle of how bullets "come out of the muzzle of a gun." Based on her calculations, which were reviewed by a peer, Agent Woodby determined the angle of impact from the horizonal plane was sixty degrees downward. She was unable to determine exactly where the shooter was in the room but was able to demonstrate to the jury the line along which the bullet traveled from the gun to the wall.

TBI Special Agent Laura Hodge testified as an expert in firearms identification that she examined the .45 caliber handgun taken from the scene of the shooting, as well as the two bullets taken from the wall of the bedroom and the one bullet from the bed. Agent Hodge determined that the three bullets were all fired from the .45 caliber semi-automatic handgun retrieved from the scene of the shooting.

Agent Hodge noted that the bullets in the handgun and the spent bullets that were retrieved from the wall and the bed were all hollow point. She explained:

- 11 -

When this bullet strikes an object, the liquid from what it strikes will fill this cavity and it will cause the bullet to mushroom or what we call expand. There's two purposes for a jacketed hollow point: one is not to over penetrate, but also do what is considered maximum damage to the intended target.

On cross-examination, Agent Hodge confirmed that the gun found on the bed was a "25 Titan" and also worked as a semi-automatic firearm.

Defendant's Proof

Debra Joyce Hale testified that she had known Defendant for approximately twenty years and was a family friend. She recalled that, a few months before the shooting, the victim said to Ms. Hale and Ms. Hale's sister: "F this, S-H-I-T, I'm so over this. I'm going home. I'm killing [B.D.], I'm killing [Defendant] and I'm killing myself. I can't live like this anymore." Ms. Hale said that Defendant was like a brother to her but that she would not perjure herself for him. She did not have any personal knowledge of the events of January 14, 2015.

Eric Carver testified that, in the spring or summer of 2013, he visited the Dunn residence, and the victim offered to sell him marijuana and said "that she grew it to individually sell." On another occasion in late 2013, the victim, Defendant, and B.D. visited Mr. Eric Carver at his home. While there, the victim asked Mr. Eric Carver to kill Defendant, but he refused. Mr. Eric Carver testified that the victim was not smiling or joking when she made this request. He recalled that his parents were present also when she made this request. He said that Defendant was present when the victim asked him to kill Defendant and that Defendant "just kind of stood there and looked at her like, you know, really, you're going to do that around somebody else, you're going to do this[?]"

Mr. Eric Carver recalled that, after the shooting, the victim came to his house and asked if she could shoot her pistol at his small firing range. He explained, "She shot her pistol a few times, turned around and looked at me and my dad both and said, 'Will you kill [Defendant?]' and held out her pistol and she said, 'If you will, I will make sure you get paid.'"

On cross-examination, Mr. Eric Carver denied that he knew Defendant was charged with attempted murder of the victim when she came to his house to use the firing range. He said that he did not report the victim's threat to law enforcement.

Rex Carver, Mr. Eric Carver's father, testified that the victim and Defendant visited his residence prior to the shooting. He recalled,

I was in the shop and just cleaned my pistol and laid it on the work bench and [the victim] come up and asked me if I would shoot [Defendant]. And I used a choice word and told her no. And then there was twice she asked me in the house, inside the house, and one time out back she asked me. . . . That's at least four times.

Mr. Rex Carver explained that the fourth time the victim asked him to kill Defendant occurred after the shooting.

On cross-examination, Mr. Rex Carver stated that he did not know why the victim would ask him to kill Defendant because he and the victim were not close. He did not report the threats to law enforcement.

Kathryn Carver, Mr. Rex Carver's wife, testified that the victim "asked my husband to shoot [Defendant] with a gun that he had had out and been cleaning . . . and my husband looked at her and thought maybe she was kidding or not, but she had a dead serious look on her. She wasn't smiling." Mrs. Carver recalled that Defendant was next to the victim when she made this request and that Defendant appeared "shocked."

Jamie Raines testified that he was friends with Defendant since 1993 and also knew the victim. He recalled that, the night before the shooting, the victim visited his home. He said that the victim was "unstable" and that she handed him a .25 pistol and asked him to shoot a few rounds outside. Mr. Raines declined, stating that it was dark and that there was "no sense in wasting ammunition." He said that the victim appeared to be "under the influence." Mr. Raines denied that he would lie for Defendant, even though they were good friends.

Michelle Raines, Mr. Raines's wife, testified that the victim came to her home unannounced the night before the shooting. It was after dark. She recalled that the victim came in and sat on her couch and that the victim had a "gun beside her hip[.]" Mrs. Raines asked the victim why she brought a gun in her home, and the victim replied that she wanted Mr. Raines to see it. Mrs. Raines said that the victim appeared "doped up" and that the victim said "something bad was going to happen. She didn't say what." Mrs. Raines denied that she would lie for Defendant.

Donna Sue Dunn, Defendant's mother, testified that, on the night of January 14, 2015, Defendant called her. Defendant told her that the victim tried to kill him and that he shot her and already called 911. Mrs. Dunn recalled that Defendant was "very upset" on the phone.

On cross-examination, Mrs. Dunn said that she lived two to three miles from Defendant's home but that she did not visit very often. She said that she did not know that Defendant had a marijuana growing operation in his home.

Following a *Momon* hearing, Defendant elected to testify. He stated that he consented to a search of his home following the shooting and that he made a statement to officers after waiving his *Miranda* rights. Defendant explained that he was not B.D.'s father but that he met B.D. when he was about nine years old. Defendant said that he was the only person who could calm B.D. down and that he took it upon himself to help B.D. learn to use the bathroom because B.D. had special needs. He recalled that B.D. became agitated whenever Defendant and the victim would argue.

Defendant said that the victim was irate when she woke up on the day of the shooting because she wanted "medication" and she did not have any. They began arguing because the victim wanted a divorce. Defendant said that he pulled up the marijuana plants, which made the victim very angry. He explained, "She said that her and her son needed that marijuana." Defendant said that the victim "picked up a pair of brass knuckles" and hit him. He said, "[I]n order to get the brass knuckles, I had to grab ahold of her and I grabbed ahold of the brass knuckles and I twisted and done everything I could while she was clawing at my hands thinking that I was going to let go, but I felt like I needed to get those brass knuckles." Defendant continued, "Once I finally did get the brass knuckles, she come (sic) back and she had a taser this time. Luckily the taser wasn't functioning properly. . . . So she hit me in the back with it." Defendant said that he "had to wrestle those away from her as well. I slid everything under the couch that I could to try . . . to make it a little more difficult for her to get them[.]"

Defendant said that the victim then tried to leave with B.D. but that he did not feel that it was safe for her to have B.D. He said,

> She pulled a gun out. It was a .25 automatic just like the pictures that you all saw. She was waving it around and as I went to go grab my gun or try to get her from waving the gun around, she had her purse with her as well. She stuck . . . the gun down in her purse and her hand remained in her purse. So I felt safe enough to grab hold of the gun and try to take it away from her and I did. And at this point, we was (sic) in the bedroom so I laid it to the side to try to comfort her, try to calm her, whatever I could.

Defendant explained that he placed the gun on the nightstand. He recalled that B.D. was in the living room and was upset. He said, "I had a disabled child that was in there and he was slapping his hand because that's what he done when he got upset, so I'm trying to comfort two different people here." Defendant said that the victim starting yelling at

- 14 -

him while he talked to B.D. He stated that, when he turned around, he saw the victim with a gun to her head, threatening suicide. Defendant said:

> I went to reach for the gun. She moved her arm. I was only able to reach and grab her arm. I wasn't able to grab the gun. And at that time, she extended her arm fully and pointed it towards my hand while I had ahold of her wrist and that's when she started to go backwards and that gun was pointed straight to my head.
>
> . . . .
>
> So as she's pulling me towards the bed and I feel my life is in danger, I fired a shot and I said, ["]Put the gun down,["] and she rolled on back to the bed and she cocked her -- this hand she put behind her to get leverage with and she cocked her feet up and she started kicking me and I fired another shot. And then I said, ["]Put the gun down.["] I mean, what do you do in that instance? And she never did put the gun down. And then she managed to kick me right in the groin and that kind of startled me and then I fired another shot and she laid the gun down and that was the end of the altercation.

Defendant stated that, if he had wanted to kill the victim, he could have. He said, "[T]o get a gun permit you have to take a shooting exam as well and yes, ma'am, I could have definitely have shot her anywheres (sic) that I picked." He explained that he was in fear for his life and that the victim was "definitely high." Defendant stated, "I felt afraid. I felt like that I had to do this. I didn't want to shoot her. I felt afraid, in fear for my life."

Defendant said that he immediately went into the living room to find a phone and call 911. The recording of the 911 call was played for the jury. Defendant stated that, after he called 911, he checked the victim's pulse and put his arm around her. He said that he tried to comfort B.D. and then called his mother. Defendant testified that, to his knowledge, the photograph that the victim took of him in the marijuana grow room was not on the victim's phone on the night of the shooting.

Defendant explained that, when the police arrived, he "went straight out with [his] hands above [his] head . . . like any officer would want you to do and [he] told [officers] what was going on to try to get her help as quickly as possible." He stated that what came across to other witnesses as indifference was actually "shock" and hoping "that she was okay[.]" Defendant stated that he did not intentionally try to kill the victim.

On cross-examination, the State re-played the 911 call, and the following exchange occurred:

- 15 -

[THE STATE]: Isn't it true, sir, that when you were telling the 911 dispatcher that my wife just tried to shoot me, she is saying, ["]No, I didn't, that's a lie?["]  You heard that, didn't you?

[DEFENDANT]: I heard her.  I guess that -- maybe that is what she said.

. . . .

[THE STATE]: So my question to you is, [d]o you recall her screaming out as you're claiming to this dispatcher [that] she tried to shoot you and therefore, you shot her, she's screaming out, "No, I didn't, that's a lie;" do you recall her saying that?

[DEFENDANT]: Yes, sir, I recall that.

Defendant agreed that he was taller, heavier, and stronger than the victim and that he was successful at taking brass knuckles, a taser, and a gun from the victim.  Defendant demonstrated for the jury how he shot the victim.  He said that he held the victim's arm so tightly that he could have broken her wrist.  Defendant said that the victim "extended her arm fully" while he was holding it and that he feared for his life.  Therefore, he pulled his gun from his back pocket and shot the victim while he was still holding her arm.  Defendant stated that the victim was on the bed and raised her feet to kick him but that he still had ahold of her arm.  Defendant shot the victim a second time.  He said that the victim kicked him in the groin, and he released her arm before firing a third time.  Defendant denied that the victim had her arms raised defensively in front of her body because "she would never put her arms like that.  She's a violent person."  The following exchange occurred:

[THE STATE]: And you're telling this jury that even after shooting her point-blank range with a hollow point, that didn't even knock her back and disable her?

. . . .

[DEFENDANT]: No, it didn't.

Defendant agreed that, even though the victim's gun was operable, she did not fire her weapon.

Defendant said that he "didn't much care for the picture" that the victim took several weeks before the shooting of him in the grow room with the marijuana plants.  He explained that he "suggested" the victim delete the photograph, which she did, and that he did not

- 16 -

know she had emailed the picture to herself. Defendant recalled that he pulled up the marijuana plants the day of the shooting because they were "causing an argument." He said that the victim threatened to "tell on [him]" any time she got angry.

Defendant denied that, after he shot the victim, he told her to "die." He agreed that he put his arm around the victim after he shot her and that, although she was bleeding profusely, he did not get any blood on his shirt.

Following deliberations, the jury found Defendant guilty of attempted second degree murder in count one, aggravated assault in count two, unlawful employment of a firearm during the commission of a dangerous felony in count three, and unlawful possession of a firearm during the commission of a dangerous felony in count four.

### *Sentencing and Motion for New Trial*

At the sentencing hearing, the trial court merged counts one and two and merged counts three and four. The trial court found that Defendant was a Range I offender. It noted that several witnesses wrote to the court on behalf of Defendant and considered the "evidence, . . . the finding of the jury, the pre-sentence investigation, statements made on [Defendant's] behalf, and on behalf of the [S]tate and the victim in this case."

The trial court found that Defendant "had a previous history of being on probation, [was] on release or probation at the time of the commission of this offense and prior to trial or sentencing[,]" and it applied enhancement factor (8). It also found that Defendant had an extensive criminal history and applied enhancement factor (1). As to count one, attempted second degree murder, the trial court found that Defendant employed a firearm during the commission of the offense and applied enhancement factor (9). Finally, because Defendant was on probation at the time of the offenses, the trial court applied enhancement factor (13). The trial court declined to apply any mitigating factors.

For count one, attempted second degree murder, the trial court sentenced Defendant to twelve years' incarceration with a thirty percent release eligibility. It explained:

> To be very candid, I've already observed that had the facts been slightly different or had the bullet been slightly placed in another area you would be looking at many, many more years than what you're looking at now. But that's what the [c]ourt is allowed to sentence. That's the maximum in that range.

- 17 -

For count three, employment of a firearm during the commission of a dangerous felony, the trial court sentenced Defendant to six years' incarceration with a 100 percent release eligibility and aligned the sentences consecutively, as mandated by statute.

Defendant filed a motion for new trial and an amended motion for new trial, which the trial court denied following a hearing. Defendant now timely appeals.

## Analysis

On appeal, Defendant argues that the trial court erred by denying cross-examination of the victim regarding her pending charges and prior criminal conduct and erred by admitting evidence of a marijuana grow room inside Defendant's residence. He asserts that the State failed to establish the chain of custody of the firearm Defendant used. Defendant also argues that the evidence was insufficient to sustain his convictions and that his sentence was excessive.

### I. Denial of Cross-Examination of the Victim Regarding Pending Charges

Defendant argues that the trial court erred in relying on *Dicks* when it excluded cross-examination regarding the victim's pending criminal charges.[2] 615 S.W.2d at 126. He contends that his case is distinguishable from *Dicks* and is more analogous to the facts in *State v. Jerry Scott Washington*, No. 01-C-01-9301-CC00012, 1993 WL 393428, at *1 (Tenn. Crim. App. Oct. 7, 1993), *perm. app. denied* (Tenn. Feb. 28, 1994), because "*Dicks* involved the questioning of a witness rather than a victim as in [*Jerry Scott*] *Washington*." *See Jerry Scott Washington*, 1993 WL 393428, at *2. Defendant argues that, like the facts in *Jerry Scott Washington*, "the [S]tate called the victim and used her testimony as the driving force of its case" and "[u]nder these circumstances, the reasoning in *Dicks* does not apply." *See id.*

The State distinguishes the present case from *Jerry Scott Washington* because the State relied almost entirely on the victim's testimony in *Jerry Scott Washington*. Here, "the State did not ask the jury to rely solely on the victim's testimony to understand the circumstances of the offense and find that [D]efendant did not act in self-defense." Instead, the State argues, the prosecution's case also relied on "extensive testimony from law enforcement witnesses as well as physical evidence from the scene, all of which corroborated the victim's testimony[.]" Alternatively, the State argues that any error was

---

[2] We note that the trial court discussed the victim's pending charges in Greene County with the prosecutor and defense counsel in a jury-out hearing. However, no police report, indictment, or other evidence of the victim's pending charges appears in the record on appeal.

- 18 -

harmless beyond a reasonable doubt pursuant to *State v. Sayles*, 49 S.W.3d 275, 280 (Tenn. 2001).

A defendant's constitutional right to confront the witnesses includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000). The denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citing *Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948); *Davis v. State*, 212 S.W.2d 374, 375 (Tenn. 1948)).

A defendant's right to confront witnesses does not preclude a trial court from imposing limits upon the cross-examination of witnesses, taking into account such factors as "harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *see also* Tenn. R. Evid. 611(a) (stating that the trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel[]"). Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts v. State*, 379 S.W.2d 34 (Tenn. 1964)).

"Tennessee Rule of Evidence 608(b) provides that specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness." *State v. Julio Ramirez*, No. M2009-01617-CCA-R3-CD, 2011 WL 2348464, at *13 (Tenn. Crim. App. Jun. 8, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011). Before a witness may be cross-examined on specific instances of conduct, the trial court must, upon request, hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry. Tenn. R. Evid. 608(b)(1). When the trial court complies with the procedural requirements of Rule 608(b), we review the trial court's decision under an abuse of discretion standard. *Julio Ramirez*, 2011 WL 2348464, at *14.

In *Dicks*, our supreme court noted that,

[i]f it appears that a witness intends to claim the [Fifth Amendment] privilege [against self-incrimination] as to essentially all questions, the court may, in

its discretion, refuse to allow him to take the stand. Neither side has a right to benefit from any inferences the jury may draw simply from the witness'[s] assertion of the privilege either alone or in conjunction with questions that have been put to him.

615 S.W.2d at 129 (quoting *United States v. Johnson*, 488 F.2d 1206, 1211 (1st Cir. 1973)); *see also State v. Linda June Cross*, No. 03C01-9810-CR-00358, 1999 WL 1076958, at *9 (Tenn. Crim. App. Nov. 30, 1999) (stating that the trial "properly refused" to allow a co-defendant to be called to the stand for the sole purpose of asserting his Fifth Amendment privilege), *perm. app. denied* (Tenn. June 12, 2000); *State v. Kenneth Stube*, No. 01-C-019104CR00123, 1992 WL 18385, at *4 (Tenn. Crim. App. Feb. 6, 1992), *perm. app. denied* (Tenn. June 8, 1992).

Ordinarily, "'Fifth Amendment issues arise when a witness completely refuses to testify.'" *State v. Shasta Jackson*, No. E2014-01387-CCA-R3-CD, 2015 WL 6756318, at *12 (Tenn. Crim. App. Nov. 5, 2015) (quoting *State v. Horace Charles Corum,* 1993 WL 467932 (Tenn. Crim. App. Nov. 15, 1993)). However, this court has held that a trial court can limit the examination of a testifying witness if the answers to certain questions will result in the witness asserting the Fifth Amendment privilege against self-incrimination. *See e.g., State v. Charles E. Lakins*, No. 03C01-9703-CR-00085, 1998 WL 128842, at *4 (Tenn. Crim. App. Mar. 24, 1998) (affirming a trial court's limiting the examination of a witness on issues where the witness would assert his Fifth Amendment privilege but permitting examination on other issues), *perm. app. denied* (Tenn. Nov. 2, 1998).

Here, the victim's prior criminal conduct that Defendant sought to introduce involved theft, which is a crime of dishonesty, and thus would typically be admissible under the Tennessee Rules of Evidence. Tenn. R. Evid. 608; *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997). The trial court held a jury-out hearing, and the victim asserted her Fifth Amendment privilege against self-incrimination regarding her pending theft charges. Therefore, the trial court excluded cross-examination on those pending charges pursuant to *Dicks*.

We find no error in the trial court's decision. The victim's right not to incriminate herself on pending criminal charges was paramount to Defendant's right to present evidence of the victim's crime of dishonesty. *Dicks*, 615 S.W.2d at 129 (stating that, "where there is a conflict between the basic right of a defendant to compulsory process and the witness's right against self-incrimination, . . . the right against self-incrimination is the stronger and paramount right"). Moreover, the evidence against Defendant's claim of self-defense was strong and relied on far more than just the victim's word. The State presented evidence from multiple law enforcement officers and TBI agents showing that the victim did not have a weapon when Defendant shot her. For example, Agent Woodby testified to

the void of blood in the nightstand drawer where the victim's gun was removed after she was shot. The victim's injuries were consistent with her holding her arms in front of her body defensively. Two audio recordings immediately after the shooting captured the victim repeatedly denying that she tried to shoot the victim or that she had a weapon in her hand, as well as begging officers not to "let [Defendant] get by with it." Officers testified that Defendant showed no emotion or concern for the victim following the shooting. We conclude that, even if Defendant had been permitted to question the victim regarding her pending charges, her assertion of her Fifth Amendment privilege in the presence of the jury would not have changed the outcome of the trial. Defendant is not entitled to relief on this issue.

## II. Alleged Evidentiary Errors

Generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." *State v. Plyant*, 263 S.W.3d 854, 870 (Tenn. 2008). A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.* (citing *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

### A. Failure to Establish Chain of Custody

Defendant argues that the trial court erred in admitting the .45 caliber handgun as evidence because the State failed to establish the chain of custody for the gun.

The State responds that the prosecution proved an unbroken chain of custody for the gun.

Tennessee Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). The Tennessee Supreme Court has previously recognized that it is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (internal quotes omitted). The purpose of the chain of custody requirement is "to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). Even though each link in the chain of custody should be sufficiently established, Rule 901(a) does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor is the State be required to establish facts which exclude every

possibility of tampering. *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (citing *Scott*, 33 S.W.3d at 760). "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* In addition, the State's failure to call as a witness each person who handled an item does not necessarily preclude the admission of the evidence. *Id.* Absent sufficient proof of the chain of custody, however, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." *Scott*, 33 S.W.3d at 760 (quoting Cohen et. al., *Tennessee Law of Evidence* § 901.12, at 624 (3d ed. 1995)).

We review challenges to the chain of custody of evidence under the abuse of discretion standard. *Cannon*, 254 S.W.3d at 295 (citing *Scott*, 33 S.W.3d at 752). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Here, Deputy Holt testified that he saw the .45 caliber handgun on the coffee table and that Defendant told him he used that gun to shoot the victim. Deputy Holt testified that he and other officers secured the scene and cleared the weapons in the house. Agent Woodby testified that the .45 caliber handgun was already in an evidence bag when she arrived and that an officer directed her to the weapon. Agent Woodby took the handgun from the home, and Agent Hodge determined that it was the weapon that was used to shoot the victim. While the person who bagged the handgun did not testify, we find that the chain of custody was sufficiently established for admission of the evidence. *Cannon*, 254 S.W.3d at 296. Moreover, the admission of the weapon had nothing to do with Defendant's claim of self-defense. Defendant testified that he shot the victim with the handgun, and he does not assert any additional prejudice resulting from the admission of the gun. *See State v. Ronald S. Strick*, No. M2005-01990-CCA-R3CD, 2007 WL 445630, at *7 (Tenn. Crim. App. Feb. 12, 2007) (stating that the State's introduction of evidence at trial was not essential to establishing the charges beyond a reasonable doubt), *perm. app. denied* (Tenn. June 18, 2007). Defendant is not entitled to relief.

### B. Admission of Defendant's Prior Bad Act – Marijuana Grow Room

Defendant argues that the trial court erred when it admitted evidence of the marijuana grow room because the evidence was unfairly prejudicial. He asserts that the evidence "supported the inference that [Defendant] was a marijuana seller." He contends that, because the victim testified that the shooting happened because she was leaving Defendant, the marijuana grow room was not relevant to motive.

The State responds that the evidence of the marijuana grow room was relevant to Defendant's motive and to rebut Defendant's claim of self-defense. It argues, "The State did not introduce the grow operation evidence to prove that [D]efendant committed the charged offenses in conformity with a character trait to commit illegal offenses."

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003).

If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if the trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. *DuBose*, 953 S.W.2d at 652.

Here, the trial court complied with the procedural requirements of Rule 404(b). It held a hearing outside the presence of the jury, it found that the State proved the prior bad act by clear and convincing evidence, it determined that the prior bad act was relevant to motive, and it concluded that the probative value of the evidence outweighed any prejudice to Defendant. Thus, we will review the trial court's decision for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652); *Baker*, 785 S.W.2d at 134.

It is clear from the record that the State's theory was that Defendant shot the victim because he was afraid she would leave the home and disclose his illegal activities to law enforcement. The victim repeatedly testified that Defendant argued with her over the photograph she took of him in the grow room and that Defendant shot her because he was afraid she would "tell on him." In her statement to Agent Sipos, she recounted that, after the shooting, Defendant told her "Die, bitch. That'll teach you to run your mouth." The State had the burden to prove beyond a reasonable doubt that the shooting was not in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). The evidence of the marijuana grow room was highly relevant to Defendant's motive and to rebutting Defendant's claim of self-defense. Prior bad act evidence is admissible under Rule 404(b) to establish motive; therefore, the trial court did not abuse its discretion when it admitted the evidence. *See Toliver*, 117 S.W.3d at 230; *McCary*, 119 S.W.3d at 243. Defendant is not entitled to relief.

### C. Denial of Evidence of the Victim's Drug Use

Defendant argues that the trial court erred by excluding a video filmed two months prior to the shooting which he claims depicted the victim's "prior drug use." He contends that admission of the video would have rebutted the victim's assertion that she was upset about the marijuana grow room in their home. Defendant argues that the video was relevant under Tennessee Rule of Evidence 401.

The State responds that Defendant has waived this claim because the video is not included in the record on appeal. Notwithstanding waiver, the State argues that there is no proof in the record that Defendant was operating the marijuana grow room at the time the video was taken in November 2014. Moreover, the State asserts that there is no proof that the cigarette in the video was marijuana, that it belonged to the victim, or that she had ingested it. The State contends that, even if all of Defendant's assumptions regarding the victim's drug use were true, "there is a distinct difference, both practically and under the laws of this state, between using marijuana and manufacturing marijuana." Finally, the State contends that Defendant rebutted the victim's testimony regarding her opposition to the grow room through the testimony of other witnesses.

"In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner." *State v. Goad*, 707 S.W.2d 846, 852 (Tenn. 1986). Here, Defendant did present an offer of proof for the trial court, and the trial court described the video when it made its ruling. However, Defendant did not move to include the video as an exhibit for identification purposes, and he did not include the video in the record on appeal. We conclude that the trial court's description of the video is sufficient for us to review Defendant's claim. *See State v. Marcus Malone*, No. W2020-00364-CCA-R3-CD, 2022 WL 558282, at *19 n.7 (Tenn. Crim. App. Feb. 24, 2022) (finding that, where evidence was "not included in the record on appeal[,]" the trial court's description was "sufficient for our review"), *perm. app. filed* (Tenn. Apr. 22, 2022).

In order for evidence to be admissible, it must be relevant. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence." Tenn. R. Evid. 401. However, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Tenn. R. Evid. 403. We review a trial court's ruling regarding the admissibility of evidence for an abuse of discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008).

Here, the video was dated in November of 2014, two months prior to the shooting. According to the trial court's description, the video depicted the victim dozing off and rubbing her head while seated next to a cigarette of some sort. We cannot see how this would be relevant to any issue at trial. Even if it were error to exclude the video, any error was harmless. Defendant presented other evidence to rebut the victim's testimony regarding her disdain for the marijuana grow room. Mr. Carver testified that the victim said she grew marijuana and offered to sell it to him. Mr. and Mrs. Raines testified that the victim appeared "under the influence" and "doped up" the night before the shooting. Defendant is not entitled to relief on this issue.

### III. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to sustain his convictions because he acted in self-defense. Defendant does not challenge the sufficiency of the evidence regarding any other element of the offenses.

The State responds that the evidence was sufficient for a rational trier of fact to find that Defendant did not act in self-defense.

- 25 -

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Tennessee Code Annotated section 39-11-611 provides:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (2015). A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). Thus, the mere fact that a defendant believes that his conduct is justified would not suffice to justify his conduct. *Id.*

It is well-established "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). Moreover, "[t]he [S]tate has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996), *rejected on other grounds by State v. Williams*, 977 S.W.2d 101 (Tenn. 1998); Tenn. Code Ann. § 39-11-201(a)(3) (2015). As such, "in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

Viewing the evidence in the light most favorable to the State, the evidence was sufficient for a rational juror to determine that Defendant did not act in self-defense. The victim testified that she and Defendant were arguing for the two weeks before the shooting regarding a photograph she took of Defendant in the marijuana grow room. On the day of the shooting, the victim told Defendant that she and B.D. were going to leave, and Defendant told her she could not leave. The victim threatened to tell law enforcement about the marijuana grow room, and Defendant shot the victim three times. The victim testified that Defendant said, "Die bitch. That'll teach you to run your mouth." Officers testified that there were trails of dirt from the grow room to outside, and the victim recalled that Defendant pulled up the marijuana plants after he shot her and took them outside the home. Moreover, the wounds on the victim's arms show that she had them defensively in front of her body, not stretched out holding a gun as Defendant claimed in his testimony. The void of blood in the nightstand, coupled with blood found only on one side of the .25 pistol lying on the bed, demonstrated that the .25 was in the nightstand during the shooting and was removed and placed on the bed after the shooting. Two audio recordings from immediately following the shooting were played for the jury in which the victim repeatedly denied that she tried to shoot Defendant or that she had a weapon in her hand and begged officers not to let Defendant "get by with it." Defendant testified that he acted in self-defense, and the jury clearly rejected this claim, as was their prerogative. *Bland*, 958 S.W.2d at 659. The evidence was sufficient for a rational juror to decide that Defendant did not act in self-defense. Defendant is not entitled to relief.

## IV. Sentencing

Defendant argues that his sentence was excessive because the trial court failed to specifically mention the mitigating factors Defendant raised when it pronounced sentencing. He contends that "[f]ailure to specifically discuss the fourteen mitigation factors raised by the defense and give them weight constituted an abuse of discretion." He also asserts that the trial court improperly relied on what may have happened "had the facts been slightly different" when it sentenced Defendant to the top of the range.

The State responds that the trial court acted within its discretion in imposing an effective eighteen-year sentence.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2020).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2020); *State v. Bise*, 380 S.W.3d at 682, 706 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2020); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the

purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2020), Sentencing Comm'n Cmts.

The trial court determined that Defendant was a Range I standard offender. It merged the aggravated assault conviction with the attempted second degree murder conviction and merged the possession of a firearm during the commission of a dangerous felony conviction with the employment of a firearm during the commission of a dangerous felony conviction. Attempted second degree murder, a Class B felony, has a sentencing range from eight to twelve years. Tenn. Code Ann. §§ 39-12-107(a), -13-210(c) (2015); 40-35-112(a)(2) (2020). Employment of a firearm during the commission of a dangerous felony, a Class C felony, has a mandatory six-year sentence in this instance, which must be served consecutive to the underlying dangerous felony. Tenn. Code Ann. § 39-17-1324(b)(1), (e)(1), (h)(1) (2020).

The trial court considered the "evidence, . . . the finding of the jury, the pre-sentence investigation, statements made on [Defendant's] behalf, and on behalf of the [S]tate and the victim in this case." Based upon the presentence report, the trial court applied enhancement factor (1) and enhancement factor (8) because Defendant had several prior convictions and "had a previous history of being on probation, [was] on release or probation at the time of the commission of this offense and prior to trial or sentencing." Tenn. Code Ann. § 40-35-114(1), (8) (2020). As to count one, attempted second degree murder, the trial court found that Defendant employed a firearm during the commission of the offense and applied enhancement factor (9). Tenn. Code Ann. § 40-35-114(9) (2020). Finally, because Defendant was on probation at the time of the offenses, the trial court applied enhancement factor (13). Tenn. Code Ann. § 40-35-114(13)(C) (2020). The trial court considered but did not apply mitigating factors:

> The [c]ourt observes that in reading the materials and the position and reviewing the statute as it relates to 40-35-113 and mitigating factors, the [c]ourt has weighed the enhancement factors. The [c]ourt does not find that there [are] any appropriate mitigating factors to weigh on your behalf that would apply in this case.

- 29 -

It is true that the trial court did not explicitly enumerate the mitigating factors raised by the defense. However, the trial court is simply required to "consider" these factors, not explicitly discuss each one. *See* Tenn. Code Ann. § 40-35-114 (2020); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *Carter*, 254 S.W.3d at 346. Moreover, the trial court selected a within-range sentence, detailed its findings on the records, and its decision is presumptively reasonable. *Bise*, 380 S.W.3d at 707. The court noted that the outcome of the shooting could have been far worse had the facts been slightly different. We find this statement to be indicative of how serious Defendant's actions were and thus supportive of the trial court's decision to impose a top of the range sentence. The trial court did not abuse its discretion, and Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE